IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| TONY SCOTT, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 13-CV-16-NJR-DGW |
| | ) |
| ANGEL RECTOR, TRACI PEEK, | ) |
| DEBORAH BULLOCK, VIPIN SHAH, | ) |
| and BRENDA GALE, | ) |
| | ) |
|       Defendants. | ) |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Tony Scott filed this *pro se* lawsuit on January 1, 2013, pursuant to 42 U.S.C. § 1983. Plaintiff claimed that the defendants were deliberately indifferent to his severe, chronic back pain in violation of his Eighth Amendment rights. Specifically, Plaintiff alleges that Defendants Traci Peek, Deborah Bullock, and Brenda Gale, who are nurses, failed to give him a referral to see a doctor for his back pain, and that Angel Rector, who is a nurse practitioner, and Dr. Vipin Shah, a physician, failed to listen to his complaints or treat his pain.

This matter is currently before the Court on a motion for summary judgment filed by Defendants Rector, Peek, Bullock, Gale, and Shah on December 31, 2013 (Doc. 89). Plaintiff filed a response to the motion for summary judgment on February 4, 2014 (Doc. 96). The Court has carefully considered the briefs and all of the evidence submitted by the parties, and for the reasons set forth below, the motion is granted.

## FACTUAL BACKGROUND

Plaintiff Tony Scott is an inmate incarcerated in the Illinois Department of Corrections. He is currently incarcerated at Graham Correctional Center, however, the events giving rise to this lawsuit occurred during the eleven months (June 2012 to May 2013) that he was incarcerated at Pinckneyville Correctional Center ("Pinckneyville CC").

According to Plaintiff, in November 2009, prior to his incarceration, he had surgery on his upper back/neck in which three discs were removed (Doc. 90-1, p. 11). After that surgery, he was told by the surgeon that two more discs in his lower back would also have to be removed in the future (*Id.* at 12). He took Vicodin and Baclofan for his continuing back pain (*Id.* at 13-17). After he was incarcerated, but before he arrived at Pinckneyville CC, Plaintiff took Tramadol for his back pain (*Id.*).

When Plaintiff arrived at Pinckneyville CC on June 26, 2012, an intake exam was conducted (Doc. 90-2, p. 1). It was noted that Plaintiff had three chronic conditions: hypertension, hyperlipidemia, and a mood disorder. His past medical and surgical history were significant for a stroke, three heart attacks and multiple stents, and spinal surgery. It was further noted that Plaintiff was taking five medications at that time—Plavix, Enalapril, Zocor, nitroglycerine, and aspirin—which were all for treating his hypertension and hyperlipidemia. There was no indication that Plaintiff was suffering from back pain or taking any pain medication.

Plaintiff was referred to the Chronic Illness Clinic for his hypertension and hyperlipidemia (*see* Docs. 90-7, 90-8). He was to receive a baseline evaluation, followed

by periodic check-ups every four months. His appointments at the cardiac clinic were meant to address only one particular medical condition—his cardiovascular health—and no other medical conditions were to be addressed at those appointments unless it was an emergency. For other non-emergency conditions, inmates were instructed to request a Nurse Sick Call. Nurse Sick Calls are how the prison provided medical services to inmates for routine, non-emergency complaints (*see* Docs. 90-3 through 90-8). The nurse could then refer an inmate to a physician if she determined that it was necessary based on her nursing assessment. Otherwise, an inmate will be referred to a physician only if the inmate was seen by a nurse three times in thirty days for the same complaint. Each time an inmate saw a nurse, he was assessed a $5.00 copayment.

Approximately two weeks after his arrival at Pinckneyville CC, on July 10, 2012, Defendant Deborah Bullock saw Plaintiff during a Nurse Sick Call (*Id.* at p. 2; Doc. 90-4, p. 1). Bullock is a Licensed Practical Nurse. According to Nurse Bullock:

> He told me that he had had back surgery 10 months before and had pain on and off. He described the pain as not severe enough to wake him at night. I noted that he had no limitations or pain with movement. I provided him with patient teaching on proper body mechanics and advised a 48 hour trial of over the counter medications before returning to Nurse Sick Call. He was charged $5.00 according to the protocol.

This was the only time Nurse Bullock treated Plaintiff.

Two days later, on July 12, 2012, Defendant Angel Rector saw Plaintiff in the Chronic Illness Clinic for a baseline evaluation of his heart condition (Doc. 90-2, p. 3; Doc. 90-7). Ms. Rector is a licensed Advanced Practice Nurse and a Certified Nurse Practitioner. Nurse Rector reviewed Plaintiff's extensive cardiovascular history and wrote him a number of related prescriptions. Plaintiff "brought up multiple unrelated

issues," however they were not addressed because they were not "urgent."

According to Plaintiff, he spoke with Nurse Rector about his back pain and showed her the papers from previous institutions indicating that he was prescribed Tramadol for his back (Doc. 90-1, pp. 17-20). Plaintiff testified at his deposition that Nurse Rector "looked at my back. She seen that I had surgery and everything. So, she pretty much had full knowledge of my problem" (*Id.* at p. 21). Plaintiff further testified that Nurse Rector told him that she would "put me in to see the doctor, but she never did. And she told me that I would be getting treatment" (*Id.* at pp. 17-18). Plaintiff also stated that Nurse Rector "put me in for some Tylenol, but I never got them . . . ." (*Id.* at 20-21).[1]

On July 22, 2012, Defendant Traci Peek, who is a Registered Nurse, saw Plaintiff to review his lab results with him (Doc. 90-6). No other medical issues were discussed (*Id.*). Nurse Peek saw Plaintiff again on July 31, 2012, during a Nurse Sick Call (*Id.*; Doc. 90-2, p. 4). In her notes from the visit, Nurse Peek wrote that Plaintiff complained "I'm having chest pain and I just took my last nitro, I need more" (Doc. 90-2, p. 4). Plaintiff then asked "Where's your wheelchair to take me to the doctor of which I've not seen yet?" (*Id.*). According to Nurse Peek, Plaintiff was:

> demanding, rude, and initially would not allow me to examine him or take his vital signs. He held his crutch up in a threatening manner and demanded to go to the Heath Care Unit. I attempted to educate Mr. Scott on the proper process to get his medication prescription refilled, however he continued to interrupt me. When I instructed Mr. Scott on the Nurse Sick Call and co-pay protocol he jumped up off his bunk and began yelling

---

[1] It is unclear to the Court whether Plaintiff is confusing Defendant Rector for Defendant Bullock (who attested that she examined Plaintiff and told him to take an over-the-counter pain medication) or whether Defendant Rector also examined Plaintiff and gave the same advice.

at me. I was then escorted off the wing by the officer.

Nurse Peek saw Plaintiff for a third time on August 2, 2012, at a Nurse Sick Call (Doc. 90-6). At that visit, Plaintiff was upset that he was seeing Nurse Peek and not a doctor. He wanted pain medication, but refused to pay the $5.00 copay. According to Nurse Peek, Plaintiff said "Who put me in to see you? I did not request to see you. I requested to see a doctor and I want pain pills and will get them however or whatever it takes. I'm not paying $5.00 to you or anyone else." Plaintiff stood in the doorway and threatened Nurse Peek with grievances. The Nurse Sick Call was refused, and Plaintiff was escorted out of the Health Care Unit.

According to Plaintiff, he told Nurse Peek about his back pain (Doc. 90-1, p. 21). Nurse Peek talked to him about his medical history, but never conducted an examination (*Id.* at p. 22). She told him to fill out a money voucher, which he did, but then she did nothing (*Id.* at 22).

On August 6, 2012, Defendant Brenda Gale saw Plaintiff for the first time at a Nurse Sick Call (Doc. 90-2, p. 5; Doc. 90-5). Ms. Gale is a Licensed Practical Nurse. Plaintiff was very agitated, demanded Nurse Gale's name, and refused the Nurse Sick Call. Nurse Gale filled out a Medical Services Refusal form documenting Plaintiff's refusal of treatment (Doc. 90-2, p. 14). That same day, Defendant Vipin Shah, a medical doctor, reviewed Plaintiff's cardiovascular status and current medications (Doc. 90-2, p. 5; Doc. 90-8). Dr. Shah prescribed Imdur for Plaintiff instead of nitroglycerine.

On August 9, 2012, Plaintiff refused to take the Imdur (Doc. 90-5). Nurse Gale completed a Medical Services Refusal form documenting Plaintiff's refusal (Doc. 90-2, p. 15). The next day, Nurse Gale saw Plaintiff at a Nurse Sick Call (*Id.* at p. 20). Plaintiff told Nurse Gale that Dr. Shah "does not know anything. This is wrong, I'm not taking it. I don't even know why he gave it to me." Nurse Gale noted that Plaintiff "[r]efuse[d] Imdur. Refuse[d] to come down. Refuse[d] to listen to nurse." Nurse Gale spoke with the doctor who told her to have Plaintiff come in and sign a medication refusal, but Plaintiff would not sign the form. On August 11, Plaintiff again refused to take his Imdur (*Id.* at pp. 17–18; Doc. 90-5). On August 13, Plaintiff refused his Imdur, refused to be seen at a Nurse Sick Call, and also refused to sign the Medical Services Refusal form (Doc. 90-2, pp. 6, 16; Doc. 90-5). Plaintiff continued to refuse his Imdur on August 14, 15, and 16 (Doc. 90-2, pp. 19-21).

According to Plaintiff, when he saw Nurse Gale, she "asked [him] questions, asked [him] to fill out a money voucher. . . . They want to take your money, but they don't want to put you into your doc. They said I got to put in like three or four times before I even see a doctor" (Doc. 90-1, p. 23).

On August 16, Dr. Shah saw Plaintiff for the first time regarding his multiple refusals to take the Imdur (Doc, 90-2, p. 7; Doc. 90-8). Due to Plaintiff's noncompliance, Dr. Shah discontinued the Imdur and reordered nitroglycerine. It was Dr. Shah's opinion that Plaintiff had no other urgent medical conditions at that time, and consequently no other medical issues were addressed.

On August 31, 2012, Plaintiff was involved in an altercation with another inmate (Doc. 90-2, p. 22; Doc. 90-8). He reported that he was shoved, fell back, and was hit in the chest. Following the altercation, he was assessed in the Healthcare Unit by a nurse. The nurse noted that Plaintiff appeared anxious, but his vital signs were stable, he had no bruising, swelling, or shortness of breath, and his pulse was strong and regular. There is no indication that Plaintiff complained of back pain or asked for pain medication. He was instructed to return to the Healthcare Unit as needed. Dr. Shah determined that Plaintiff had no urgent medical needs that would require evaluation by a physician.

On October 5, 2012, Plaintiff saw a physical therapy assistant to have the tips on his quad cane replaced because they were worn (Doc. 90-2, p. 8). There is no indication that Plaintiff complained of back pain to the physical therapist assistant.

On November 19, 2012, Dr. Shah saw Plaintiff for the third time in the Chronic Illness Clinic for a periodic evaluation of his cardiovascular status (Doc. 90-2, p. 9; Doc. 90-8). No other medical issues were addressed during this visit. According to Plaintiff, each time that he saw Dr. Shah, he wanted to talk to him about his back condition and not his heart condition, but Defendant Shah stated that he would only see him with respect to his heart condition (Doc. 90-1, p. 26).

On February 28, 2013, Plaintiff had the tips replaced on his cane (Doc. 90-2, p. 10). Again, there is no indication that he complained of back pain to the physical therapy assistant.

Plaintiff's next periodic evaluation in the Chronic Illness Clinic was on March 4, 2013 (Doc. 90-2, p. 11; Doc. 90-7). On this visit, Plaintiff was seen by Ms. Rector, who evaluated his cardiovascular status. No other medical issues were addressed during this visit.

On April 15, 2013, Plaintiff had the tips replaced on his cane for a third time (Doc. 90-2, pp. 12–13). On this occasion, the physical therapist assistant noted that Plaintiff was told that he should see Nurse Sick Call for his other medical issues (*Id.* at 12). On May 21, 2013, Plaintiff was transferred to Western Correctional Center (Doc. 90-1, p. 5).

During his time at Pinckneyville, Plaintiff states that he received no medication for his back pain, that on an average day his back pain was a five or six on a scale of one to ten, and that he was unable to participate in "pretty much everything" (Doc. 90-1, p. 24). He stated, "I couldn't hardly walk around, you know. It was hard for me to get up and down, you know what I'm saying. And I as very uncomfortable like trying to sleep. Sleep was thrown off, everything. You know, I pretty much could do nothing" (*Id.* at 24-25).

Along with his response to the Motion for Summary Judgment, Plaintiff provided medical records from July and August 2013 at Western Correctional Center (Doc. 96, pp. 7–18). These records reveal that Plaintiff did not receive any medical care for his back pain for the first three months he was at Western. Then, in August 2013, he was written a prescription for ibuprofen, which he took for the next three months (*Id.*; *see* Doc. 90-1, pp. 29–30). It was not until

November 2013—six months after he arrived at Western Correctional Center—that he was given a prescription for Tramadol because the over-the-counter pain medication was no longer working (Doc. 90-1, pp. 29–30).

## DISCUSSION

### A. Legal Standard for Summary Judgment

The standard applied to summary judgment motions under Federal Rule of Civil Procedure 56 is well-settled and has been succinctly stated as follows:

> Summary judgment is proper when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. In determining whether a genuine issue of material fact exists, [the Court] must view the record in a light most favorable to the nonmoving party. Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, setting forth specific facts showing that there is a genuine issue for trial . . . . A mere scintilla of evidence in support of the nonmovant's position is insufficient; a party will be successful in opposing summary judgment only when it presents definite, competent evidence to rebut the motion.

*Albiero v. City of Kankakee*, 246 F.3d 927, 931-32 (7th Cir. 2001) (citations and quotations omitted). No issue remains for trial "unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (citations omitted).

### B. Legal Standard for Deliberate Indifference to a Serious Medical Need

The Supreme Court has recognized that "deliberate indifference to serious medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on a

deliberate indifference claim, there are "two high hurdles, which every inmate-plaintiff must clear." *Dunigan ex rel. Nyman v. Winnebago County*, 165 F.3d 587, 590 (7th Cir. 1999). First, the plaintiff must demonstrate that his medical condition was "objectively, sufficiently serious." *Greeno v. Daley*, 414 F.3d 645, 652-653 (7th Cir. 2005) (citations and quotation marks omitted). A serious medical condition is one "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007).

Second, the plaintiff must demonstrate that the "prison officials acted with a sufficiently culpable state of mind." *Greeno*, 414 F.3d at 653. To do so, the plaintiff must put forth evidence that the prison officials knew that the prisoner's medical condition posed a serious risk to the prisoner's health, and *they* consciously disregard that risk. *Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). In order for a medical professional to be held liable under the deliberate indifference standard, he or she must respond in a way that is "so plainly inappropriate" or make a decision that is "such a substantial departure from accepted professional judgment, practice, or standards," that it gives rise to the inference that they intentionally or recklessly disregarded the prisoner's needs. *Id.*; *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008) (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

C. **Analysis**

Defendants do not contest the first prong of the deliberate indifference analysis—that Plaintiff had a serious medical condition. Therefore, the issue presented

by the summary judgment motion is whether Defendants were deliberately indifferent to Plaintiff's serious medical condition.

### 1. Nurses Bullock, Peek, and Gale

With respect to the Defendants who are nurses,[2] Plaintiff claims that they were deliberately indifferent to his serious medical condition because he made them aware of his back pain, but they did not refer him to a doctor or give him any medication (Doc. 96). In considering the facts in the light most favorable to Plaintiff, however, the Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact regarding whether any of the nurses were deliberately indifferent to his serious medical needs.

With respect to Nurse Bullock, the evidence shows that she saw Plaintiff on one occasion during a Nurse Sick Call where he complained about back pain. After he paid the $5.00 copay, Nurse Bullock examined and evaluated Plaintiff. He described intermittent pain that was not severe enough to keep him from sleeping. Upon examination, Nurse Bullock noted that Plaintiff had no limitations or pain with movement. She educated Plaintiff on proper body mechanics, and advised a 48-hour trial of over-the-counter pain relievers before returning to Nurse Sick Call. Thus, the undisputed evidence shows that Nurse Bullock addressed Plaintiff's complaints and developed a course of treatment. There is no evidence that this course of treatment was plainly inappropriate in light of Plaintiff's complaints, or that Plaintiff required an

---

[2] The Court notes that Plaintiff's claim against Nurse Rector is slightly different than his claims against Nurses Bullock, Peek, and Gale. Unlike the other nurses, Nurse Bullock was a nurse practitioner, and therefore, she did not have to refer Plaintiff to a physician in order for him to obtain a prescription because she had the power to prescribe medications herself. Accordingly, Plaintiff's claim against Nurse Rector is more akin to his claim against Dr. Shah, and the Court will consider those two claims in conjunction in the next section.

immediate referral to a doctor. Accordingly, Nurse Bullock is entitled to summary judgment on Plaintiff's claim of deliberate indifference.

Turning next to Nurse Peek, the evidence shows that Plaintiff did not complain about his back pain the first two times he saw Nurse Peek. The third time he saw Nurse Peek, however, Plaintiff indicated that he wanted pain medication. Nurse Peek instructed Plaintiff that he had to pay the $5.00 co-payment, but Plaintiff refused. It is clear that Nurse Peek did not ignore Plaintiff's complaints or outright deny medical care; she simply insisted that he submit the required co-payment before she would provide care, which he refused to do. "The Eighth Amendment does not compel prison administrators to provide cost-free medical services to inmates who are able to contribute to the cost of their care." *Poole v. Isaacs*, 703 F.3d 1024, 1026 (7th Cir. 2012). And an inmate who "opt[s] to refuse treatment rather than part with his money" cannot prevail on an Eighth Amendment claim because "[e]ven though he was in pain until he received treatment, the delay in receiving care was of his own making." *Id.* at 1027. Accordingly, Nurse Peek is entitled to summary judgment on Plaintiff's claim of deliberate indifference.

With respect to Nurse Gale, there is no evidence that Plaintiff ever complained to her about his back pain. Instead, the evidence shows that each time Nurse Gale saw Plaintiff, it was related to his heart medication. But even if Nurse Gale knew Plaintiff was suffering from back pain, there is no evidence that she refused to provide him treatment or to refer him to a physician. Instead, the evidence shows that each time Nurse Gale saw Plaintiff, he was indignant that he was not seeing a doctor, he refused to

pay the co-payment, he would not allow her to examine him, and he obstinately refused to accept any of the treatment that she offered him. These facts, construed in the light most favorable to Plaintiff, cannot support a claim of deliberate indifference. *See Pinkston v. Madry*, 440 F.3d 879, 892 (7th Cir. 2006) (affirming denial of deliberate indifference claim where inmate refused to cooperate with medical staff or accept the medical assistance offered to him); *Beck v. Skon,* 253 F .3d 330 (8th Cir. 2001) (affirming denial of deliberate indifference claim where prison officials attempted to meet inmate's medical needs and were rebuffed by inmate). Accordingly, Nurse Gale is entitled to summary judgment on Plaintiff's claim of deliberate indifference.

Based on the evidence presented, including the medical records, Defendants' affidavits, and Plaintiff's deposition testimony, it appears to the Court that the crux of Plaintiff's complaint is that he wanted to see a physician who was able to prescribe narcotic or opioid painkillers whenever he made such a request, rather than following the prison's protocol and first seeing a nurse. But Plaintiff is not entitled to "demand specific care" or to receive "unqualified access to healthcare." *Holloway v. Delaware County Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012) (quotation marks and citations omitted); *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) (citation omitted). He is only entitled to "adequate medical care." *Holloway*, 700 F.3d at 1073. There is no evidence or argument that the care the nurses at Pinckneyville CC were prepared to provide to Plaintiff fell below the standard of adequate medical care. It was simply not the care that Plaintiff wanted. Had Plaintiff cooperated with the nurses and paid the $5 co-payment, he surely would have received over-the-counter pain relievers. If he

returned to see a nurse two more times within thirty days, he would have been referred to the doctor that he insisted he was entitled to see. Plaintiff did not receive any pain relievers or a referral to a doctor due his own stubborn refusal to follow the prison's protocol, not the nurses' deliberate indifference.

### 2. Nurse Rector and Dr. Shah

With respect to Nurse Rector and Dr. Shah, Plaintiff claims that they were deliberately indifferent to his serious medical condition because they ignored his complaints of back pain and did not provide him with any treatment (Doc. 96). In considering the facts in the light most favorable to Plaintiff, however, the Court finds that he has failed to demonstrate a genuine issue of material fact regarding whether Nurse Rector and Dr. Shah were deliberately indifferent to his serious medical needs.

The undisputed evidence shows that Nurse Rector and Dr. Shah saw Plaintiff a total of four times at the cardiac clinic. According to Plaintiff, he complained to both of them about his back pain and asked for medical care for his pain. Both refused to discuss his back pain and told him that he had to submit a co-payment and be seen in Nurse Sick Call before he could be treated for ailments unrelated to his heart.

To the extent that Nurse Rector and Dr. Shah refused to discuss Plaintiff's back pain during those visits, it is undisputed that Plaintiff's pain was not an emergency. It is also undisputed that Plaintiff had not been referred to either of them following an evaluation by a nurse, and he had not presented to Nurse Sick Call three times in the past thirty days. It was not deliberate indifference for Nurse Rector or Dr. Shah to insist that Plaintiff follow the prison's protocol for obtaining care for non-emergency medical conditions. *See Poole v. Isaacs,* 703 F.3d 1024, 1026, 1027 (7th Cir. 2012); *Hightower v.*

*Godinez*, 524 Fed.Appx. 294, 296 (7th Cir. 2013) (citing *Poole*, 703 F.3d at 1027) (affirming dismissal of deliberate indifference claim against physician's assistant who told inmate at prison cardiac clinic that his dermatitis, misaligned vertebrae, jaw pain, and ear pain could not be treated without first paying co-pay); *Conley v. Anglin*, 513 Fed.Appx. 598, 602 (7th Cir. 2013) (affirming dismissal of deliberate indifference claim against physician who allegedly refused to send inmate to hospital until he submitted the co-pay). Accordingly, Nurse Rector and Dr. Shah are entitled to summary judgment on Plaintiff's claim of deliberate indifference.

## CONCLUSION

For the foregoing reasons, the motion for summary judgment filed by Defendants Angel Rector, Traci Peek, Deborah Bullock, Brenda Gale, and Dr. Vipin Shah (Doc. 89) is **GRANTED,** and this action is **DISMISSED with prejudice**. The Clerk of Court is **DIRECTED** to enter judgment in favor of all Defendants and against Plaintiff.

IT IS SO ORDERED.

DATED:   November 12, 2014

s/ Nancy J. Rosenstengel
**NANCY J. ROSENSTENGEL**
**United States District Judge**